UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY MEDINA,<br><br>        Petitioner,<br><br>   v.<br><br>C. PFEIFFER,<br><br>        Respondent. | No. 2:17-cv-1837-MCE-EFB P<br><br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner is a California state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On October 27, 2011 and in the Sacramento County Superior Court, he was convicted of: (1) two counts of attempted first degree murder (Pen. Code, §§ 664, 187, subd. (a)) with two enhancements for discharging a firearm and causing great bodily injury (former § 12022.53, subd. (d)); (2) one count of shooting at an occupied vehicle (§ 246) with identical enhancements; (3) unlawful possession of a firearm (former § 12021, subd. (a)); (4) attempted robbery (§§ 664, 211), and (5) one count of first degree murder (§ 187, subd. (a)) with an attempted robbery special circumstance (§ 190.2, subd. (a)(17)(A)). Those convictions stem from two separate incidents. The two counts of attempted murder, one count for shooting into an occupied vehicle, and one count of unlawful possession of a firearm arose out of the events of May 2, 2008, described in the next section. The counts for attempted robbery and first degree murder arose out of the events of May 5, 2008.

Petitioner raises the following claims in the immediate petition: (1) there was insufficient evidence to support the attempted robbery special circumstance (i.e., the May 5 events); and (2) the trial court erred when it excluded "gang evidence with regard to the May 2nd shooting" which negated petitioner's intended defense. Respondent filed an answer to these claims. ECF No. 13.

## BACKGROUND[1]

I.  Events of May 2, 2008

A.  Prosecution Case

Early in the morning of May 2, 2008, appellant departed a liquor store on Florin Road in Sacramento. He was driving a Silver Impala belonging to Brittany Sarantis, his then fifteen year old girlfriend. Sarantis was seated beside petitioner in the front passenger seat. Also in the car were David Whitehead, Brandon Morton, and Waylon Rocha, all of whom were riding in the back seat.

While petitioner and the others drove from the liquor store, a black Lexus approached them and began driving erratically. Morton stated that if they pulled up to the Lexus he would "get them." Sarantis would later tell law enforcement that, after Morton made this comment, he handed petitioner a gun from the back seat. Sarantis reclined horizontally in her seat and, as the two cars pulled alongside one another, petitioner fired the gun out of the front passenger window.

The Lexus was being driven by Angeo Granados. Miguel Ramos, his cousin, was in the back passenger seat. Ramos sustained a gunshot wound to his knee and Granados was hit in the upper thigh. At the time of the shooting, Ramos was dating Sarantis' cousin. Sarantis stated that she had had contact with Ramos through her cousin, but that she did not recognize Ramos as being a passenger in the other car the night of the shooting.

Ramos later testified that, at the time of the shooting, he and Granados had been travelling back from a friend's house in Bakersfield. He stated that, when they stopped at a red light, a white Oldsmobile Cutlass pulled alongside their car and shot at them. Ramos testified that he

---

[1] The court relates the background to the extent it is relevant to petitioner. It elects to exclude background information which bears only on co-defendants David Whitehead and Brandon Morton.

believed there were three to four males in the Cutlass, one of whom was African-American and the rest of whom were Hispanic. Ramos stated that, after the shots were fired, Granados drove westbound on Florin Road and he lost track of where the Cutlass went.

Granados, by contrast, had difficulty recalling the events of May 2, 2008 by the time of trial. He testified that he had suffered a gunshot wound to his leg, but could not recall the specifics of how he received the wound. During a law enforcement interview roughly one week after the incident, however, Granados stated that he and Ramos were travelling back from a relatives' house. Granados told the interviewing detective that he had stopped at a red light and a vehicle pulled up to the driver side of the Lexus. Granados stated that the driver of the other vehicle had shot at him and, in response, he had "gunned it."

On May 19, 2008, a Sacramento Police detective interviewed Armando Mora – a former prisoner who had been staying with petitioner at the Governor's Inn. Mora stated that he had overheard a conversation in which petitioner stated that he was going to buy two guns. Mora also told the detective that petitioner drove a silver or grey Chevy Impala. Finally, Mora stated that petitioner had told him that he had "gotten into it" with some guy on Florin Road and that petitioner had shot at the other man.

B.     Defense Case

Petitioner testified that he had fired at the Lexus because he feared for his life. He stated that, after watching the Lexus drive erratically, he became convinced that the other car would ultimately collide with the Impala. He said he picked up the gun because he was afraid that the occupants of the Lexus intended to harm him and the other individuals riding in the Impala.

Petitioner testified that he had past issues with the Franklon gang, to which he had once belonged but ultimately dropped out. He stated that he had received death threats from members of that gang and that the gang blamed him for the death of one of its members. The Franklon gang had shot at petitioner's brother – who bore a resemblance to petitioner – and had a reputation for carrying out shootings.

Petitioner stated that, on May 2, 2008, he heard the driver of the Lexus say "is that him right there?" Petitioner saw the other driver put his hand beneath his seat as if he were fishing for

3

a gun.  Concerned for his safety, petitioner made a snap decision to fire first.  Petitioner fired at a low trajectory, away from the heads of those in the Lexus.

II.       Events of May 5, 2008

      A.       Prosecution Case

In 2008, Holly Sarmento was romantically involved with Brandon Morton (who, as noted above, was a passenger in the Impala the night of the May 2 shooting).  At the time, Sarmento was working as a prostitute and using methamphetamine.  Sarmento was close friends with Jennifer Cauble and Jason Fletcher.

On May 5, 2008, Morton wanted half an ounce of methamphetamine and asked Sarmento to call Cauble in order to procure it.  Sarmento did so, and Cauble agreed to find a seller.  Morton gave Sarmento seven-hundred dollars for the drugs.  Sarmento, Cauble, and an individual named "Tim" travelled to make the purchase.

Sarmento gave the seven-hundred dollars to Cauble and told her Morton's desired amount.  Cauble took the money, purchased the drugs, and told Sarmento that it was the right quantity.  The pair took Tim home.  Sarmento would later testify that Cauble told her that Tim had added money for the transaction and would be taking his share of the drugs.  Cauble denied this at trial.

Sarmento stated that she and Cauble then travelled to Oak Park and smoked some of the methamphetamine.  Cauble denies this.  Regardless, Sarmento ultimately dropped Cauble off at her home and proceeded to Morton's residence to deliver the drugs.  Morton was not home at that time, but he instructed Sarmento to leave the methamphetamine with the "girl" who answered the door.  Sarmento did so and left.

Morton called Sarmento later that evening and angrily stated that he had been short-changed on the methamphetamine.  He believed Cauble was responsible and stated that he wanted either his money back or the proper amount of methamphetamine.  Morton called Cauble and they agreed to meet.  Cauble went to the meeting with Fletcher, who was her boyfriend, and a friend named Marty Rainville.  Prior to the meeting, Sarmento travelled to Morton's residence.  She noted that David Whitehead (also a passenger in the Impala the night of the May 2 shooting) was present.  Morton then got into Sarmento's car, and the two travelled to the meeting.

The meeting was to occur at a post office parking lot between 11 p.m. and 12 a.m., but Cauble and Fletcher drove past the lot at the appointed time.  Morton and Sarmento followed them into a residential neighborhood.  The cars pulled over on the side of the road and Morton approached the driver's side of Fletcher's vehicle in order to speak with him.  Cauble was in the front passenger seat of Fletcher's vehicle and Rainville was in the back passenger area.  Morton got into the backseat with Rainville and presented the methamphetamine to Cauble.  Cauble weighed the drugs and noted that it did not look like the methamphetamine she had purchased earlier and weighed substantially less.

Meanwhile, Morton and Rainville began arguing in the back seat.  Morton suspected Rainville had a gun.  The two argued over which was armed.  At approximately this time, Cauble noticed that another car had arrived and parked across the street.  Petitioner and Whitehead exited the newly arrived car and approached Fletcher's car.

Then, Morton exited the car, approached the driver-side window, and pointed a gun at Fletcher.  Morton ordered Fletcher out of the car and directed him to leave the car keys.  Petitioner joined Morton.  Whitehead pulled out a gun and aimed it at Cauble.  Cauble believed all three men had guns, but Sarmento was unsure petitioner did.  Fletcher, Cauble, and Rainville exited the car with guns trained on them.  Cauble sat on the sidewalk.  Sarmento briefly joined Cauble on the sidewalk before Morton ordered her to return to their car.

Petitioner, Morton, and Whitehead directed Fletcher and Rainville across the street.  Having done so, petitioner returned to the car he had arrived in.  Whitehead entered Sarmento's car and drove away from the scene.  Morton entered Fletcher's car and attempted to start it.  The steering column of the car was damaged, however, and Morton could not start the engine.  Morton exited the car and approached Fletcher.  Fletcher still had his hands up when Morton shot him twice and ran away.

Rainville and Cauble made an unsuccessful attempt to get medical help from nearby residents.  Ultimately, they carried Fletcher back to his car, placed him in the back seat, and drove to a hospital.  Fletcher was admitted, but died as a result of his wounds.

/////

5

B.    Defense Case

Petitioner stated that his intention in going to the meeting was simply to ensure that Morton got his money back and that nothing happened to him.  He stated that he did not intend to be involved in a drug deal or take anything from the sellers in such a transaction.  Petitioner stated that he left his handgun at home, feeling no need to take it.  He was surprised when, at the confrontation, Whitehead and Morton drew their handguns.

After the guns were drawn and Fletcher and Rainville escorted across the street, petitioner got back in the Impala he had driven to the meeting.  He started the car and intended to leave, but Morton gestured for him to wait.  Shortly thereafter, petitioner heard gunshots.  Morton jumped into the backseat of the Impala and they left the scene with Whitehead following in the other car.  Petitioner maintained that he did not know that Morton was going to shoot or even, at that time, whether Morton had been the one to fire the shots.  After driving some distance from the scene, petitioner angrily told Morton to get out of his car.  Other than a call from Morton to tell petitioner that he was in jail, petitioner had no further contact with him.

Morton testified at trial that petitioner had nothing to do with the May 5th drug transaction.  Morton also testified that: (1) he did not ask petitioner to bring a gun to the May 5 meeting; (2) he did not see petitioner in possession of a gun the night of the meeting; and (3) there was no plan to shoot or rob anyone that night.

III.    Trial Outcome

As noted above, petitioner was convicted of: (1) two counts of attempted first degree murder (Pen. Code, §§ 664, 187, subd. (a)) with two enhancements for discharging a firearm and causing great bodily injury (former § 12022.53, subd. (d)); (2) one count of shooting at an occupied vehicle (§ 246) with identical enhancements; (3) unlawful possession of a firearm (former § 12021, subd. (a)); (4) attempted robbery (§§ 664, 211), and (5) one count of first degree murder (§ 187, subd. (a)) with an attempted robbery special circumstance (§ 190.2, subd. (a)(17)(A)).

/////

/////

1    IV.    Post-Conviction Proceedings

2         Petitioner's sentences were modified by the court of appeal on direct appeal, but their

3    sentences were otherwise affirmed.  The California Supreme Court also denied petitioner's claims

4    on the merits.  After the California Supreme Court decided *People v. Banks*, 61 Cal.4th 788

5    (2015), the court of appeal reconsidered petitioner's claims and denied them anew on the merits.

6    The California Supreme Court subsequently issued the final state merits denial of petitioner's

7    claims.  Petitioner filed the instant petition on September 5, 2017.

8              STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

9    I.    Applicable Statutory Provisions

10        28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of

11   1996 ("AEDPA"), provides in relevant part as follows:

12            (d) An application for a writ of habeas corpus on behalf of a person
             in custody pursuant to the judgment of a state court shall not be
13           granted with respect to any claim that was adjudicated on the merits
             in State court proceedings unless the adjudication of the claim -
14

15            (1) resulted in a decision that was contrary to, or involved
             an unreasonable application of, clearly established Federal
             law, as determined by the Supreme Court of the United
16           States; or

17            (2) resulted in a decision that was based on an unreasonable
             determination of the facts in light of the evidence presented
18           in the State court proceeding.

19        Section 2254(d) constitutes a "constraint on the power of a federal habeas court to grant a

20   state prisoner's application for a writ of habeas corpus."  *(Terry) Williams v. Taylor*, 529 U.S.

21   362, 412 (2000).  It does not, however, "imply abandonment or abdication of judicial review," or

22   "by definition preclude relief."  *Miller El v. Cockrell*, 537 U.S. 322, 340 (2003).  If either prong

23   (d)(1) or (d)(2) is satisfied, the federal court may grant relief based on a de novo finding of

24   constitutional error.  *See Frantz v. Hazey*, 533 F.3d 724, 736 (9th Cir. 2008) (en banc).

25        The statute applies whenever the state court has denied a federal claim on its merits,

26   whether or not the state court explained its reasons.  *Harrington v. Richter*, 562 U.S. 86, 100

27   (2011).  State court rejection of a federal claim will be presumed to have been on the merits

28   absent any indication or state law procedural principles to the contrary.  *Id.* at 784-785 (citing

                                                    7

*Harris v. Reed*, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785.

A.    "Clearly Established Federal Law"

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. *Lockyer v. Andrade*, 538 U.S. 63, 71 72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether . . . the particular point in issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013).

B.    "Contrary To" Or "Unreasonable Application Of" Clearly Established Federal Law

Section 2254(d)(1) applies to state court adjudications based on purely legal rulings and mixed questions of law and fact. *Davis v. Woodford*, 384 F.3d 628, 637 (9th Cir. 2003). The two clauses of § 2254(d)(1) create two distinct exceptions to AEDPA's limitation on relief. *Williams*, 529 U.S. at 404-05 (the "contrary to" and "unreasonable application" clauses of (d)(1) must be given independent effect, and create two categories of cases in which habeas relief remains available).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." *Id.* at 405. This includes use of the wrong legal rule or analytical framework. "The addition, deletion, or alteration of a factor in a test established by the Supreme Court also constitutes a failure to apply controlling Supreme Court law under the 'contrary to' clause of the AEDPA." *Benn v. Lambert*, 283 F.3d 1040, 1051 n.5 (9th Cir. 2002). *See, e.g., Williams*, 529 U.S. at 391, 393 95 (Virginia Supreme Court's ineffective assistance of counsel analysis "contrary to" *Strickland*[2] because it

---

[2] *Strickland v. Washington*, 466 U.S. 668 (1984).

8

added a third prong unauthorized by *Strickland*); *Crittenden v. Ayers*, 624 F.3d 943, 954 (9th Cir. 2010) (California Supreme Court's *Batson*[3] analysis "contrary to" federal law because it set a higher bar for a prima facie case of discrimination than established in *Batson* itself); *Frantz*, 533 F.3d at 734 35 (Arizona court's application of harmless error rule to *Faretta*[4] violation was contrary to U.S. Supreme Court holding that such error is structural). A state court also acts contrary to clearly established federal law when it reaches a different result from a Supreme Court case despite materially indistinguishable facts. *Williams*, 529 U.S. at 406, 412 13; *Ramdass v. Angelone*, 530 U.S. 156, 165 66 (2000) (plurality op'n).

A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407 08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 21 (2003). This does not mean, however, that the § (d)(1) exception is limited to applications of federal law that "reasonable jurists would all agree is unreasonable." *Williams*, 529 U.S. at 409 (rejecting Fourth Circuit's overly restrictive interpretation of "unreasonable application" clause). State court decisions can be objectively unreasonable when they interpret Supreme Court precedent too restrictively, when they fail to give appropriate consideration and weight to the full body of available evidence, and when they proceed on the basis of factual error. *See, e.g., Williams*, 529 U.S. at 397-98; *Wiggins,* 539 U.S. at 526 28 & 534; *Rompilla v. Beard*, 545 U.S. 374, 388 909 (2005); *Porter v. McCollum*, 558 U.S. 30, 42 (2009).

The "unreasonable application" clause permits habeas relief based on the application of a governing principle to a set of facts different from those of the case in which the principle was announced. *Lockyer*, 538 U.S. at 76. AEDPA does not require a nearly identical fact pattern before a legal rule must be applied. *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). Even a

---

[3] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[4] *Faretta v. California*, 422 U.S. 806 (1975).

general standard may be applied in an unreasonable manner. *Id.* In such cases, AEDPA deference does not apply to the federal court's adjudication of the claim. *Id.* at 948.

Review under § 2254(d) is limited to the record that was before the state court. *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011). The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it. *Id.* In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." *Id.* at 182.

Where the state court's adjudication is set forth in a reasoned opinion, § 2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis." *Frantz*, 533 F.3d at 738 (emphasis in original). A different rule applies where the state court rejects claims summarily, without a reasoned opinion. In *Richter*, *supra*, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny. *Richter*, 562 U.S. at 101-102.

C.    "Unreasonable Determination Of The Facts"

Relief is also available under AEDPA where the state court predicated its adjudication of a claim on an unreasonable factual determination. Section 2254(d)(2). The statute explicitly limits this inquiry to the evidence that was before the state court.

Even factual determinations that are generally accorded heightened deference, such as credibility findings, are subject to scrutiny for objective reasonableness under § 2254(d)(2). For example, in *Miller El v. Dretke*, 545 U.S. 231 (2005), the Supreme Court ordered habeas relief where the Texas court had based its denial of a *Batson* claim on a factual finding that the prosecutor's asserted race neutral reasons for striking African American jurors were true. *Miller El*, 545 U.S. at 240.

An unreasonable determination of facts exists where, among other circumstances, the state court made its findings according to a flawed process – for example, under an incorrect legal standard, or where necessary findings were not made at all, or where the state court failed to consider and weigh relevant evidence that was properly presented to it. *See Taylor v. Maddox*, 366 F.3d 992, 999 1001 (9th Cir.), *cert. denied*, 543 U.S. 1038 (2004). Moreover, if "a state

court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in a 'unreasonable determination' of the facts" within the meaning of § 2254(d)(2). *Id.* at 1001; accord *Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir. 2003) (state court's factual findings must be deemed unreasonable under section 2254(d)(2) because "state court . . . refused Nunes an evidentiary hearing" and findings consequently "were made without . . . a hearing"), *cert. denied*, 543 U.S. 1038 (2004); *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) ("state courts could not have made a proper determination" of facts because state courts "refused Killian an evidentiary hearing on the matter"), *cert. denied*, 537 U.S. 1179 (2003).

A state court factual conclusion can also be substantively unreasonable where it is not fairly supported by the evidence presented in the state proceeding. *See, e.g., Wiggins*, 539 U.S. at 528 (state court's "clear factual error" regarding contents of social service records constitutes unreasonable determination of fact); *Green v. LaMarque*, 532 F.3d 1028 (9th Cir. 2008) (state court's finding that the prosecutor's strike was not racially motivated was unreasonable in light of the record before that court); *Bradley v. Duncan*, 315 F.3d 1091, 1096 98 (9th Cir. 2002) (state court unreasonably found that evidence of police entrapment was insufficient to require an entrapment instruction), *cert. denied*, 540 U.S. 963 (2003).

II.     The Relationship Of § 2254(d) To Final Merits Adjudication

To prevail in federal habeas proceedings, a petitioner must establish the applicability of one of the § 2254(d) exceptions and also must also affirmatively establish the constitutional invalidity of his custody under pre AEDPA standards. *Frantz v. Hazey*, 533 F.3d 724 (9th Cir. 2008) (en banc). There is no single prescribed order in which these two inquiries must be conducted. *Id.* at 736 37. The AEDPA does not require the federal habeas court to adopt any one methodology. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

In many cases, § 2254(d) analysis and direct merits evaluation will substantially overlap. Accordingly, "[a] holding on habeas review that a state court error meets the ' 2254(d) standard will often simultaneously constitute a holding that the [substantive standard for habeas relief] is satisfied as well, so no second inquiry will be necessary." *Frantz*, 533 F.3d at 736. In such cases,

relief may be granted without further proceedings. *See, e.g., Goldyn v. Hayes*, 444 F.3d 1062, 1070 71 (9th Cir. 2006) (finding § 2254(d)(1) unreasonableness in the state court's conclusion that the state had proved all elements of the crime, and granting petition); *Lewis v. Lewis*, 321 F.3d 824, 835 (9th Cir. 2003) (finding § 2254(d)(1) unreasonableness in the state court's failure to conduct a constitutionally sufficient inquiry into a defendant's jury selection challenge, and granting petition); *Williams v. Ryan*, 623 F.3d 1258 (9th Cir. 2010) (finding § 2254(d)(1) unreasonableness in the state court's refusal to consider drug addiction as a mitigating factor at capital sentencing, and granting penalty phase relief).

In other cases, a petitioner's entitlement to relief will turn on legal or factual questions beyond the scope of the § 2254(d) analysis. In such cases, the substantive claim(s) must be separately evaluated under a de novo standard. *Frantz*, 533 F.3d at 737. If the facts are in dispute or the existence of constitutional error depends on facts outside the existing record, an evidentiary hearing may be necessary. *Id.* at 745; *see also Earp*, 431 F.3d 1158 (remanding for evidentiary hearing after finding § 2254(d) satisfied).

DISCUSSION

I. <u>Sufficiency of the Evidence</u>

Petitioner argues that there was insufficient evidence to support the attempted robbery special circumstance attached to his first degree murder conviction. In support of this claim, he points to the fact that the jury found not true an enhancement for personal use of a firearm.

A. <u>Last Reasoned Decision</u>

Petitioner presented this claim on direct appeal and it was denied on the merits, first by the Court of Appeal (Lodg. Docs. 1 & 2) and then by the California Supreme Court (Lodg. Docs. 3 & 4). Subsequent to the California Supreme Court's decision in *People v. Banks*, 61 Cal. 4th 788 (2015), the Court of Appeal reconsidered this claim and again denied it on the merits. Lodg. Doc. 7. Finally, petitioner renewed the claim to the California Supreme Court, which issued a final, summary denial on the merits. Lodg. Doc. 8. The last reasoned decision(s) belongs to the Court of Appeal which, on pre-*Banks* direct appeal, held:

/////

*Insufficient Evidence of Attempted Robbery*

All defendants contend there is insufficient evidence of attempted robbery. They contend Morton was attempting only to retrieve his own drugs from Cauble and Fletcher, so there was no attempt to take the property of another, as required for attempted robbery.

A. *The Law*

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) "[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

Section 211 defines robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." "An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.) "The act required must be more than mere preparation, it must show that the perpetrator is putting his or her plan into action. That act need not, however, be the last proximate or ultimate step toward commission of the crime. [Citation.]" (*People v. Bonner* (2000) 80 Cal.App.4th 759, 764.)

"A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime. [Citation.]" (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.)

B. *Sufficient Evidence of Attempted Robbery of Fletcher's Car*

Cauble's testimony provided substantial evidence of attempted robbery of Fletcher's car.[5] When Medina and Whitehead arrived as backup, Morton got out of Fletcher's car and ordered the others out at gunpoint. He told Fletcher to leave the keys. While Medina and Whitehead detained Fletcher and Rainville at gunpoint, Morton attempted unsuccessfully to start the car and asked Cauble how to start it. The only reasonable inference from this evidence is that he was trying to steal the car.

---

[5] We discuss the attempted robbery of the drugs in Part VII, *post*. [footnote number 3 in original text].

13

Defendants note the jury acquitted them of attempted carjacking, suggesting the evidence of the attempt to take the car cannot be considered. But we need not ignore the evidence supporting the charge of attempted carjacking to determine if there is sufficient evidence of attempted robbery. "The law generally accepts inconsistent verdicts as an occasionally inevitable, if not entirely satisfying, consequence of a criminal justice system that gives defendants the benefit of a reasonable doubt as to guilt, and juries the power to acquit whatever the evidence." (*People v. Palmer* (2001) 24 Cal.4th 856, 860.) "[I]f an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both. [Citations.]" (*People v. Santamaria* (1994) 8 Cal.4th 903, 911.) "The jury may have been convinced of guilt but arrived at an inconsistent acquittal or not true finding 'through mistake, compromise, or lenity....' [Citation.]" (Ibid.)

"[T]he criminal justice system must accept inconsistent verdicts as to a single defendant. [Citation.] ... ' "[A] criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with the problems caused by inconsistent verdicts. Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt. [Citations.] This review should be independent of the jury's determination that evidence on another count was insufficient. The Government must convince the jury with its proof, and must also satisfy the courts that given this proof the jury could rationally have reached a verdict of guilt beyond a reasonable doubt. We do not believe that further safeguards against jury irrationality are necessary." ' [Citation.]" (*People v. Superior Court* (Sparks) (2010) 48 Cal.4th 1, 13.)

### C. Sufficient Evidence Medina and Whitehead Aided and Abetted

Medina and Whitehead contend there is insufficient evidence they shared Morton's intent to rob. They contend the evidence shows the actions of all defendants were directed at negotiating settlement of the disputed drug deal.

Neither presence at the scene of a crime nor failure to prevent its commission is sufficient alone to establish aiding and abetting. (*People v. Stankewitz* (1990) 51 Cal.3d 72, 90.) "Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense." (*In re Lynette* G. (1976) 54 Cal.App.3d 1087, 1094.) "In addition, flight is one of the factors which is relevant in determining consciousness of guilt. [Citation.]" (*Id*. at p. 1095.)

Given the violent events of May 2, the jury could easily reject the argument that Medina and Whitehead were ignorant of any intent to commit a violent crime on May 5 where the evidence showed they

were prepared to "settle" the dispute and recover drugs or money at gunpoint. Medina and Whitehead were not merely present when Morton tried to steal Fletcher's car, but actively assisted him. Medina and Whitehead joined Morton in walking Fletcher and Rainville across the street at gunpoint and detained them so that Morton could then return to the car and try to take it. They all fled afterwards. Medina waited to serve as Morton's getaway driver after the robbery failed and Whitehead returned to provide further assistance once he heard shots.

Sufficient evidence supports the convictions for attempted robbery, felony murder, and Morton's conviction for the attempted robbery special circumstance.

We next consider the sufficiency of the evidence to support the special circumstance as to Medina and Whitehead.

III

*Insufficient Evidence of Special Circumstance for Aiders and Abettors*

Medina and Whitehead contend there is insufficient evidence to support the attempted robbery special circumstance as to them. They contend there is insufficient evidence that they each were a major participant in the attempted robbery or that they acted with reckless indifference to life.

A. *The Law*

In order to find a special circumstance true where the defendant is not the actual killer, section 190.2, subdivision (d) requires that he have acted with "reckless indifference to human life and as a major participant" in the commission of the underlying felony. (*People v. Estrada* (1995) 11 Cal.4th 568, 575 (*Estrada*).) These two requirements—having a reckless disregard for human life and being a major participant—will often overlap. (*Tison v. Arizona* (1987) 481 U.S. 137, 158 & fn. 12 [95 L.Ed.2d 127, 145 & fn. 12].)

Our Supreme Court held in Estrada that "'reckless indifference to human life' is commonly understood to mean that the defendant was subjectively aware that his or her participation in the felony involved a grave risk of death. The common meaning of the term 'indifference,' referring to 'the state of being indifferent,' is that which is 'regarded as being of no significant importance or value.' (Webster's New Internat. Dict. (3d ed.1981) p. 1151, col. 1.) To regard something, even to regard it as worthless, is to be aware of it. (See id. at p. 1911, col. 1 ['regard' is synonymous with 'consider, evaluate, judge'].)" (*Estrada*, *supra*, 11 Cal.4th at p. 577.)

A reckless indifference for human life is implicit where a defendant knowingly engages in criminal activities known to carry a grave risk of death. (*Estrada*, *supra*, 11 Cal.4th at p. 580.) A reckless indifference to human life has been found where a defendant knows someone has been shot or injured and flees instead of helping the

victim. (*People v. Lopez* (2011) 198 Cal.App.4th 1106, 1117; *People v. Smith* (2005) 135 Cal.App.4th 914, 927–928 (*Smith* ); *People v. Hodgson* (2003) 111 Cal.App.4th 566, 579–580 (*Hodgson* ).)

We have defined "major participant" as follows: "In this context, we believe the phrase 'major participant' is commonly understood and is not used in a technical sense peculiar to the law. The common meaning of 'major' includes 'notable or conspicuous in effect or scope' and 'one of the larger or more important members or units of a kind or group.' (Webster's New Internat. Dict., [ (3d ed. 1971) ] p. 1363.)" (*People v. Proby* (1998) 60 Cal.App.4th 922, 933–934.) A major participant is not limited to the ringleader. (*Id.* at p. 934.)

To be a major participant in a robbery murder, a defendant does not have to be armed or participate in the actual taking. In *Hodgson*, *supra*, 111 Cal.App.4th at page 568, the defendant "held open the electric gate of an underground parking garage of an apartment complex to facilitate the escape of his fellow gang member who had robbed and shot to death a woman just after she opened the gate with her key card." Although the defendant was not armed and did not take the stolen property, the court found sufficient evidence he was a major participant in the crimes. (*Id.* at p. 578.) There was not a large group or several accomplices, only defendant and his cohort, so his role was more essential. By slowing down the closing of the electric gate, defendant was instrumental in assisting the actual killer to escape. (*Id.* at p. 580.) As the only person assisting the actual killer, "his actions were both important as well as conspicuous in scope and effect." (*Ibid.*) In *Smith*, *supra*, 135 Cal.App.4th at page 928, defendant was a major participant in an attempted robbery where he was one of only three robbers and served as the only lookout, standing outside the motel room where the attempted robbery turned murder occurred.

We review a challenge to the sufficiency of the evidence to support a special circumstance finding under the same standard we use to review the sufficiency of the evidence to support a conviction. (*People v. Cole* (2004) 33 Cal.4th 1158, 1229; *People v. Mayfield* (1997) 14 Cal.4th 668, 790–791 (*Mayfield* ).)

B. *Analysis*

There was substantial evidence Medina and Whitehead acted with reckless indifference to human life. Whitehead held Fletcher and Rainville at gunpoint while Morton attempted to steal the car. Although the jury found not true the firearm enhancement as to Medina, as discussed ante, we may consider Cauble's testimony that Medina was armed. Further, both Medina and Whitehead "had to be aware use of a gun to effect the robbery presented a grave risk of death." (*Hodgson*, *supra*, 111 Cal.App.4th at p. 580.) The events of May 2 established members of this group were not reluctant to shoot. Further, once Fletcher was shot, Medina fled rather than offer assistance to the victim. Whitehead returned when he heard shots, but fled with the others once he knew his companions were safe.

There was also substantial evidence both Medina and Whitehead were major participants. As in *Smith*, *supra*, 135 Cal.App.4th at p. 928, there were only three perpetrators. Both provided the "muscle" for the attempted robbery, which did not begin until they arrived. Whitehead, at least, held the victims at gunpoint, and Medina helped Morton, the actual killer, escape. (*Hodgson*, *supra*, 111 Cal.App.4th at p. 580.)

*People v. Medina*, 2015 WL 581385, at *8–10 (Cal.App. 3 Dist., 2015). Upon reconsideration, and after *Banks* was decided, the Court of Appeal re-addressed this claim and held:

III

*Insufficient Evidence of Special Circumstance for Aiders and Abettors*

Medina and Whitehead contend there is insufficient evidence to support the attempted robbery special circumstance as to them. They contend there is insufficient evidence that they each were a major participant in the attempted robbery or that they acted with reckless indifference to life.

A. *The Law*

The special circumstance statute applies not only to actual killers, but also to certain aiders and abettors of first degree murder. (§ 190.2, subds. (c), (d).) An aider and abettor who does not have the intent to kill may still be convicted of special circumstance murder where he "with reckless indifference to human life and as a major participant" aids and abets certain underlying felonies. (§ 190.2, subd. (d).) "The statute thus imposes both a special actus reus requirement, major participation in the crime, and a specific mens rea requirement, reckless indifference to human life." (*Banks*, supra, 61 Cal.4th at p. 798, 189 Cal.Rptr.3d 208, 351 P.3d 330, fn. omitted.)

This language in section 190.2, subdivision (d) is taken from *Tison v. Arizona* (1987) 481 U.S. 137 at page 158, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127, 145 (*Tison*): "[W]e simply hold that major participation in the felony committed, combined with reckless indifference to human life, is sufficient" to satisfy the constitutional culpability requirement for death eligibility. These two requirements—having a reckless disregard for human life and being a major participant—will often overlap. (*Ibid.* at p. 158 & fn. 12, 107 S.Ct. at p. 1688 & fn. 12, 95 L.Ed.2d at p. 145 & fn. 12.) *Tison* defined "reckless disregard for human life" as "knowingly engaging in criminal activities known to carry a grave risk of death." (*Id.* at p. 157, 107 S.Ct. 1676; *see also People v. Estrada* (1995) 11 Cal.4th 568, 577, 46 Cal.Rptr.2d 586, 904 P.2d 1197.)

In *Banks*, the California Supreme Court considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant so as to be statutorily eligible for the death penalty." (*Banks*, *supra*, 61 Cal.4th at p. 794, 189 Cal.Rptr.3d 208,

351 P.3d 330.) Our high court reversed the special circumstance finding against Lovie Troy Matthews, who acted as a getaway driver for an attempted robbery of a medical marijuana dispensary that resulted in the shooting death of the dispensary's security guard. (*Ibid.*) The dispensary had a metal security door providing access from the sidewalk and behind that door sat a security guard who verified patients' identification and physician's medical marijuana recommendation before escorting patients through a second locked door. (*Id.* at p. 795, 189 Cal.Rptr.3d 208, 351 P.3d 330.) The dispensary also had surveillance cameras. (*Ibid.*)

Matthews waited in a car blocks away while his three armed confederates entered the dispensary, gained access past the second locked door, and "began tying up employees and searching the premises." (*Banks*, *supra*, 61 Cal.4th at p. 795, 189 Cal.Rptr.3d 208, 351 P.3d 330.) Shots were fired and the three men fled. A witness outside the dispensary saw the security guard pushing the front door closed from the outside; one of the robbers reached around from the inside and shot the guard, who fell to the ground. The shooter stepped out of the building and shot the guard again. (*Ibid.*) Matthews picked up two of the three perpetrators in his car. (*Id.* at p. 795, 189 Cal.Rptr.3d 208, 351 P.3d 330.) There were a number of telephone calls between Matthews and the shooter before, during, and after the shooting. (*Id.* at pp. 795–796, 189 Cal.Rptr.3d 208, 351 P.3d 330.)

In finding the special circumstance provision did not apply to the evidence presented against Matthews, the court emphasized that "Matthews was absent from the scene, sitting in a car and waiting. There was no evidence he saw or heard the shooting, that he could have seen or heard the shooting, or that he had any immediate role in instigating it or could have prevented it." (*Banks*, *supra*, 61 Cal.4th at p. 805, 189 Cal.Rptr.3d 208, 351 P.3d 330.)

In reaching its conclusion, our high court considered not only *Tison*, but also *Enmund v. Florida* (1982) 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140, a case on which Tison builds. (*Banks*, *supra*, 61 Cal.4th at p. 799, 189 Cal.Rptr.3d 208, 351 P.3d 330.) The Banks court described *Enmund* as follows: "In that case, defendant Earl Enmund purchased a calf from victim Thomas Kersey and in the process learned Kersey was in the habit of carrying large sums of cash on his person. A few weeks later, Enmund drove two armed confederates to Kersey's house and waited nearby while they entered. When Kersey's wife appeared with a gun, the confederates shot and killed both Kerseys. Enmund thereafter drove his confederates away from the scene and helped dispose of the murder weapons, which were never found. He was convicted of robbery and first degree murder and sentenced to death. [Citations.]" (*Banks*, at p. 799, 189 Cal.Rptr.3d 208, 351 P.3d 330.)

The *Enmund* court found a broad consensus against imposing the death penalty "where the defendant did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder." (*Enmund v. Florida*, *supra*, 458 U.S. at p. 795, 102 S.Ct. at p. 3375, 73 L.Ed.2d at p. 1150.) The court held the Eighth Amendment prohibited the death penalty for one "who

18

does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." (*Id.* at p. 797, 102 S.Ct. at p. 3376, 73 L.Ed.2d at p. 1151.) It reversed the judgment upholding the death penalty for Emmund. (*Id.* at p. 801, 102 S.Ct. at pp. 3378–3379, 73 L.Ed.2d at p. 1154.)

In *Tison*, the United States Supreme Court revisited the issue of death sentences for accomplices to felony murder, in a case presenting significantly more egregious facts. In *Tison*, Gary Tison's sons Ricky, Raymond, and Donald Tison entered a prison with a large ice chest of weapons and armed their father and his cellmate, both convicted murderers. Brandishing the weapons, the group locked guards and visitors in a closet. During the subsequent escape, their car, already on its spare tire, suffered another flat, so the group agreed to flag down a passing motorist and steal a replacement car. Raymond waved down a family of four (the Lyonses); the others then emerged from hiding and captured the family at gunpoint. Raymond and Donald drove the family into the desert in the Tisons' car with the others following in the Lyonses' car. The Tisons transferred the possessions between the two cars, keeping guns and money from the Lyonses' car. The Lyons family begged for their lives and for water. As Gary's sons were getting water, Gary and his cellmate killed all four Lyons family members with repeated shotgun blasts. When the Tisons were later apprehended at a roadblock, Donald was killed and Gary escaped into the desert, where he died of exposure. Ricky and Raymond Tison and the cellmate were tried and sentenced to death. (*Tison*, *supra*, 481 U.S. at pp. 139–141, 107 S.Ct. at pp. 1678–1680, 95 L.Ed.2d at pp. 132–134.)

The Tison court distinguished Emmund: "Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery, each petitioner was actively involved in every element of the kidnapping-robbery and was physically present during the entire sequence of criminal activity culminating in the murder of the Lyons family and the subsequent flight." (*Tison*, *supra*, 481 U.S. at p. 158, 107 S.Ct. at p. 1688, 95 L.Ed.2d at p. 144.) The court set forth the rule, codified in section 190.2, subdivision (d): "[M]ajor participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Emmund culpability requirement." (*Ibid.*)

The *Banks* court also considered *Kennedy v. Louisiana* (2008) 554 U.S. 407 at page 421, 128 S.Ct. 2641, 171 L.Ed.2d 525, "where the court in dicta characterized the governing standard as permitting the death penalty for nonkillers whose 'involvement in the events leading up to the murders was active, recklessly indifferent, and substantial.'" (*Banks*, *supra*, 61 Cal.4th at p. 800, 189 Cal.Rptr.3d 208, 351 P.3d 330.) The *Banks* court then examined Emmund and Tison more closely and found: "A sentencing body must examine the defendant's personal role in the crimes leading to the victim's death and weigh the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime. [Citations.]" (*Banks*, at p. 801, 189 Cal.Rptr.3d 208, 351 P.3d 330.) As to the mental aspect of culpability, "[t]he defendant must be aware of and willingly involved in the violent manner in which the

particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Ibid.*)

The *Banks* court set forth several factors that distinguish Enmund and Tison, indicating they may be useful in determining whether a defendant qualifies as a major participant acting with a reckless disregard for human life. "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used? No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major' [citations]." (*Banks*, *supra*, 61 Cal.4th at p. 803, 189 Cal.Rptr.3d 208, 351 P.3d 330, fn. omitted.)

Although *Tison* and *Enmund* involved the death penalty, *Banks* explained: "[T]he standards we articulate, although developed in death penalty cases, apply equally to cases like this one involving statutory eligibility under section 190.2(d) for life imprisonment without parole." (*Banks*, *supra*, 61 Cal.4th at p. 804, 189 Cal.Rptr.3d 208, 351 P.3d 330.) Banks made a few points clear. First, where the plan does not include the use of lethal force, "absence from the scene may significantly diminish culpability for death." (*Id.* at p. 803, 189 Cal.Rptr.3d 208, 351 P.3d 330, fn. 5.) Second, knowledge of the possible risk of death inherent in certain felonies—like armed robbery and knowledge that confederates are armed—are insufficient alone to show a reckless indifference to human life. (*Id.* at p. 809, 189 Cal.Rptr.3d 208, 351 P.3d 330.) The court disapproved two appellate court decisions to the extent they held awareness that a robbery accomplice is armed is sufficient alone to show reckless disregard for human life or a subjective awareness of a grave risk of death. (*Id.* at p. 809, fn. 8, 189 Cal.Rptr.3d 208, 351 P.3d 330.)

With the new guidance provided by *Banks*, we consider whether substantial evidence supports the special circumstance as to Medina and Whitehead.

We review a challenge to the sufficiency of the evidence to support a special circumstance finding under the same standard we use to review the sufficiency of the evidence to support a conviction. (*People v. Cole* (2004) 33 Cal.4th 1158, 1229, 17 Cal.Rptr.3d 532, 95 P.3d 811.)

/////

/////

B. *Analysis*

1. *Medina*

Following *Banks*, we conclude there was substantial evidence that Medina both was a major participant and acted with reckless indifference to human life. There was evidence he was involved in setting up the attempted robbery. He alerted Morton to the shortage of the drugs and agreed to accompany Morton to confront the suppliers. While Medina claims the plan was simply to get Morton's money back, it was clear Morton intended to use force, if necessary, and was preparing for an armed confrontation. There was evidence that Medina was armed and suspected the others would be. Medina was also involved in the actual attempted robbery, which did not begin until he and Whitehead arrived. There was evidence Medina, as well as Morton and Whitehead, pulled out a gun and used it—first pointing it at the group and then walking Fletcher and Rainville across the street at gunpoint.[6]

Medina remained at the scene throughout. He waited at Morton's direction and made no attempt to intervene or avert the violence that followed. There was evidence, beyond his mere participation in an attempted armed robbery, that Medina was subjectively aware his participation involved a grave risk of death. (*Banks*, *supra*, 61 Cal.4th at pp. 807–808, 189 Cal.Rptr.3d 208, 351 P.3d 330.) The events of May 2 indicated that Morton, as well as Medina, was willing to employ potentially deadly violence. There was evidence that on May 2 Morton handed Medina the gun he fired and that Morton had a gun and threatened "to get them." Medina had known Morton a long time and presumably knew Morton was a drug dealer and a felon. In describing the shooting, Medina told the police, "when the gun comes out, I was like oh, fuck, dude, so I went back to my car," although at trial he denied he knew what was going to happen. The record is unclear exactly how close Medina was to the shooting, but he testified the shots were "real close," so close he thought he might get shot. After the shooting, Medina drove Morton away and made no attempt to aid the victim.

Unlike Matthews in *Banks*, Medina was not simply a getaway driver. (*Banks*, *supra*, 61 Cal.4th at p. 805, 189 Cal.Rptr.3d 208, 351 P.3d 330.) Rather, he was "actively involved in every element of the [attempted robbery] and was physically present during the entire sequence of criminal activity culminating in the murder of [Fletcher] and the subsequent flight." (*Tison*, *supra*, 481 U.S. at p. 158, 107 S.Ct. at p. 1688, 95 L.Ed.2d at p. 144.) There was evidence he played a role both in planning and executing the criminal enterprise, had and used a gun, and his prior experience with Morton gave him an awareness of the danger and risk of death. He helped Morton escape

---

[6] As we explained in the unpublished portion of this opinion, the jury could consider evidence that Medina was armed and used his gun even though the jury acquitted Medina of the personal use of a firearm enhancement. [footnote number 4 in original text].

and had no concern for the shooting victim. (*See Banks*, *supra*, 61 Cal.4th at p. 803, 189 Cal.Rptr.3d 208, 351 P.3d 330.) Substantial evidence supports the special circumstance finding.

*People v. Medina*, 200 Cal.Rptr.3d 133, 139–43, 245 Cal.App.4th 778, 787–92 (Cal.App. 3 Dist., 2016).

### B. Clearly Established Federal Law

Due process requires that each essential element of a criminal offense be proven beyond a reasonable doubt. *United States v. Winship*, 397 U.S. 358, 364 (1970). In reviewing the sufficiency of evidence to support a conviction, the question is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1974). If the evidence supports conflicting inferences, the reviewing court must presume "that the trier of fact resolved any such conflicts in favor of the prosecution," and the court must "defer to that resolution." *Id.* at 326. A jury's credibility determination is not subject to review during post-conviction proceedings. *Schlup v. Delo*, 513 U.S. 298, 330 (1995) ("under *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review."). The federal habeas court determines the sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. *Jackson*, 443 U.S. at 324 n.16.

### C. Objective Reasonableness Under § 2254(d)

Petitioner notes that the jury declined to find an enhancement for personal use of a firearm against him. Consequently, he argues that the court of appeal erred when it considered evidence that he was armed with a gun in upholding the attempted robbery special circumstance. Petitioner has failed to cite any Supreme Court decision which holds that sufficiency of the evidence review must be reconciled with inconsistent verdicts, however. To the contrary, the Supreme Court has noted:

> [A] criminal defendant . . . is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with the problems caused by inconsistent verdicts. Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable

22

doubt. This review should be independent of the jury's determination that evidence on another count was insufficient.

*United States v. Powell*, 469 U.S. 57, 67 (1984). Thus, this argument is unpersuasive.

Petitioner also argues that the court of appeal's decision improperly focused on his "vicarious responsibility for the underlying offense [of] robbery instead of his individual responsibility for loss of life." ECF No. 1 at 4. To the extent this statement can be construed to raise a more general insufficiency of the evidence claim, it also fails. As the court of appeal found, there was ample evidence in the record from which a reasonable finder of fact could have found true the attempted robbery special circumstance. Petitioner knew of Morton's intent to get his drug deal money back from Cauble. RT Vol. III (Lodg. Doc. 3) at 856, 933. Cauble testified that petitioner produced a handgun from his pocket during the confrontation with her, Fletcher, and Rainville. RT Vol. II (Lodg. Doc. 3) at 637-38. Cauble's testimony included a physical description of petitioner's gun. *Id.* at 553-54. Finally, Cauble testified as to Morton's attempt to steal Fletcher's car after its occupants had been detained at gunpoint by petitioner, Morton, and Whitehead. *Id.* at 556-60. Thus, there was sufficient evidence from which a reasonable fact-finder could find the robbery special circumstance true.

II.      Exclusion of Gang Evidence

Petitioner argues that the trial court erred by excluding "gang evidence with regard to the May 2nd shooting," thereby depriving him of his "sole justification for his actions." ECF No. 1 at 9.

A.      Last Reasoned Decision

The court of appeal denied petitioner's exclusion of evidence claim on direct appeal:

*Exclusion of Rocha's Testimony and Gang Evidence*

Medina contends the trial court erred in excluding testimony from Rocha that he believed the men in the Lexus were gang members and he feared them, and in excluding evidence that Ramos was a gang member and of gang indicia found in the Lexus. Medina contends this error was prejudicial because it was devastating to his self-defense claim.

/////

A. *Background*

Before trial, the People moved to exclude any evidence of the gang affiliations of Ramos or Granados. Ramos had admitted he had previously been validated as a Norteño gang member in 2004. The police found red clothing in the car that they believed was connected to a gang. Cell phone photographs also indicated a gang connection.

Medina objected to the exclusion, arguing this evidence was "a very critical aspect of the defense." That defense was self-defense. Rocha would testify he feared becoming a victim of a gang-related shooting, and his testimony would corroborate the perspective of Medina and others in his car.

The court granted the motion to exclude evidence of any gang affiliation. The court ruled Rocha could testify about his observations of the Lexus, but not about his conclusions, particularly any mention of his fear of gang involvement. The court found Rocha's state of mind was irrelevant. Medina raised the issue multiple times; each time, the court ruled the same way.

B. *Analysis*

The trial court properly excluded the evidence of any gang affiliation of Ramos and Granados. Gang evidence is inadmissible to show a criminal disposition.[7] (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449; *People v. Perez* (1981) 114 Cal.App.3d 470, 477.) Although Medina contends the evidence would show that his fear of the Lexus and its occupants was reasonable, there was no evidence that he knew the occupants of the Lexus or that they were gang members. The reasonableness of Medina's belief must be measured by what he saw and what he knew. "The law [of self-defense] recognizes that the objective component is not measured by an abstract standard of reasonableness but one based on the defendant's perception of imminent harm or death. Because his state of mind is a critical issue, he may explain his actions in light of his knowledge concerning the victim. [Citations.]" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1094.) Evidence of the victim's reputation for dangerousness or his prior acts of violence are relevant to a claim of self-defense only if the defendant knew of the victim's reputation or violent acts. (*People v. Tafoya* (2007) 42 Cal.4th 147, 165; *People v. Cash* (2002) 28 Cal.4th 703, 726.)

Rocha's testimony that he believed and feared that the occupants of the Lexus were gang members was inadmissible for the same reason. Rocha's fear was irrelevant because there was no evidence that Rocha communicated his belief to Medina. Rocha was permitted to testify about what he observed of the Lexus, both its erratic driving and the motions of its occupants. From this testimony and Medina's

---

[7] Medina's proffer did not include any argument that the gang evidence was relevant to motive or any other permissible use. (*See*, *e.g.*, *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 [evidence of gang affiliation may be relevant and admissible to help prove identity, motive, modus operandi, specific intent, or other issues].) [footnote number 4 in original text].

testimony the jury was able to assess the reasonableness of Medina's need for self-defense.

*People v. Medina*, 2015 WL 581385, at *10–11 (Cal.App. 3 Dist., 2015).

### B. Clearly Established Federal Law

The Supreme Court has held that "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *see also Montana v. Egelhoff*, 518 U.S. 37, 53 (1996) ("[T]he introduction of relevant evidence can be limited by the State for a 'valid' reason."). In *Nevada v. Jackson*, the Supreme Court noted that "[o]nly rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." 133 S. Ct. 1990, 1992 (2013). The exclusion of evidence violates a defendant's right to present a complete defense only where the exclusion is arbitrary and the exclusion "infringed upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308; *see also Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir. 1987) ("Incorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected.").

The Ninth Circuit has identified a five factor balancing test which weighs "(1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense." *Su Chia v. Cambra*, 360 F.3d 997, 1004 (9th Cir. 2004).

### C. Objective Reasonableness Under § 2254(d)

As noted *supra*, the court of appeal found that there was no evidence that petitioner was aware of Ramos and Granados' gang affiliations at the time of the May 5 incident. Petitioner has not offered any argument to the contrary in his current petition. The court of appeal went on to note that, under California law, a victim's violent reputation or prior acts of violence are pertinent to a theory of self-defense only if the defendant is actually aware of those acts or reputation. This court is bound by that interpretation of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations

25

on state-law questions."). As a consequence, the victim's gang affiliation had limited evidentiary value and could not have constituted a major part of petitioner's theory of self-defense. Thus, the court concludes that petitioner's claim does not present the rare case where exclusion of evidence under a state rule precluded the right to present a complete defense.

<u>CONCLUSION</u>

For all the reasons explained above, the state courts' denial of petitioner's claims was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d). Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. *See* Rule 11, Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: September 25, 2018.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE